IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE KOGAN LAW GROUP, P.C., | ) | Civil Action No. |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT H. BRACE, BEVERLY O. | ) | |
| BRACE, RANDALL J. BRACE, | ) | |
| RONALD D. BRACE, ROBERT BRACE | ) | |
| FARMS, INC., and ROBERT BRACE & | ) | |
| SONS, Inc. | ) | |

*Defendants*

**COMPLAINT FOR MONETARY DAMAGES AND EQUITABLE RELIEF**

COMES NOW, The Kogan Law Group, P.C. ("Plaintiff" or "KLG"), and complaining of

Defendants say:

**INTRODUCTORY STATEMENT**

1.　　Plaintiff Kogan Law Group, P.C. ("the Plaintiff" or "KLG"), engaged in the solo

practice *inter alia* of federal environmental law and policy work, brings this action against its

former clients, Defendants Robert H. Brace, Beverly O. Brace, Randall J. Brace, Ronald D. Brace,

Robert Brace Farms, Inc., and Robert Brace & Sons, Inc. ("the Defendants" or "the Braces") to

recover unpaid legal services fees and unpaid advanced related reimbursable expenditures, plus

pre-judgment interest and costs of suit, for the Plaintiff's provision of legal services on the

Defendants' behalf during 2018 and 2019 as the special environmental defense counsel the

Defendants had solicited and hired to represent them and protect their interests in two separate but

parallel federal government-initiated environmental litigations assigned to two different federal

district court judges sitting in the United States District Court for the Western District of

Pennsylvania.

## JURISDICTION, VENUE AND PARTIES

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of jurisdiction between the parties, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

3.      The Plaintiff ("The Kogan Law Group, P.C." or "KLG") is an active professional corporation engaged in the practice of law incorporated under the laws of the State of New York, with its principal place of business located in Manhattan Borough, New York County, New York, and thus, is a citizen of New York State.

4.      Defendants Robert Brace Farms, Inc. (Entity # 766931) and Robert Brace & Sons, Inc. (Entity # 973866) are active corporations incorporated under the laws of the Commonwealth of Pennsylvania that are also citizens of the Commonwealth of Pennsylvania having a principal place of business located in Waterford Township, Erie County, Pennsylvania.

5.      Defendants Robert Brace and Beverly Brace are the individual shareholders, officers (respectively President, and Vice President and Secretary) and key employees of Defendant Robert Brace Farms, Inc., and Defendants Robert Brace, Randall Brace, and Ronald Brace are the individual shareholders, officers (respectively Secretary, President, and Treasurer) and key employees of Defendant Robert Brace & Sons, Inc., and each such individual Defendant is an individual citizen of the Commonwealth of Pennsylvania residing in Warren Township, Erie County, Pennsylvania.

6.      This Court has jurisdiction over the subject matter of this action, furthermore, because this dispute is not otherwise covered by 22 NYCRR 137.0 et seq., known as the New York State Fee Dispute Resolution Program.

7.     Although the retainer/engagement agreement the parties executed on January 25, 2017 generally states the parties had agreed to resolve legal fee disputes pursuant to this program, said program does not apply to legal fee amounts in dispute of more than $50,000 (22 NYCRR 137.1(b)(2)), the engagement agreement did not specify, that the client has read the official written instructions and procedures for Part 137, and the parties have not since consented to arbitration to resolve legal fee disputes in excess of $50,000, as 22 NYCRR 137.2(b) requires.

8.     Venue in this District is proper, and this Court possesses personal jurisdiction over all Defendants pursuant to New York State's long-arm statute (NYCPLR § 302(a)(1)).

9.     The Plaintiff transacts legal business in the State of New York.

10.    Defendants Robert Brace and Beverly Brace had first purposively solicited the Plaintiff's principal, Lawrence Kogan ("Kogan"), at a property rights conference convened in Latham, New York during October 2016, and thereafter via telephone and email communications.

11.    During December 2016 and early January 2017, Defendant Robert Brace, again solicited Kogan during telephone discussions he had initiated via the Plaintiff's New York telephone number, to review the U.S. Department of Justice ("USDOJ")'s allegations against the Defendants concerning Clean Water Act wetlands violations, and the USDOJ's threat to file new federal actions against them, for purposes of ultimately retaining the Plaintiff as their primary environmental defense counsel in these actions.

12.    Defendant Robert Brace began to transmit emails to Kogan in New York beginning during early January 2017, which contained attached legal documents regarding the prior '90 action and a subsequent related Federal Court of Claims Tucker Act action, and ultimately regarding the two new actions USDOJ filed on January 9, 2017.

13.     On or about January 10 or January 11, 2017, during a telephone discussion Defendant Robert Brace had initiated with Kogan via the Plaintiff's New York telephone number, Defendant Robert Brace requested that Kogan visit the Defendants at their offices in Erie, Pennsylvania during January 2017 to discuss with them (Defendants Robert Brace, Beverly Brace, Randall Brace and Ronald Brace) Defendants' legal options with respect to the two new USDOJ lawsuits filed on January 9, 2017.

14.     During January 16-18, 2017, Kogan visited with the Defendants at their Erie, Pennsylvania  offices to engage in such discussions, to review additional documents, and to see the farm tracts that were the subject matter of the two new federal actions, for which work time and related reimbursable travel and lodging expenditures the Plaintiff invoiced the Defendants and the Defendants promptly paid. (Ex. 1).[1]

15.     Upon his return to New York on January 19, 2017, the Defendants provided further documentation to Kogan via email for the Plaintiff to review in New York, and Defendants requested that Kogan provide to them his firm's Engagement Agreement because the Defendants intended to hire the Plaintiff as the lead environmental defense counsel in both new federal actions (i.e., the '90 and '17 actions).

16.     On January 25, 2017, Defendant Robert Brace, acting in both his individual capacity, and his capacity as Majority Owner-Manager of Defendants Robert Brace Farms, Inc. and Robert Brace & Sons, Inc., executed the KLG-Brace Engagement Agreement for Legal, Consultative and Advisory Services ("KLG-Brace Engagement Agreement"), which the Plaintiff

---

[1] In accordance with Rule 1.16(b)(5)(ii) of the New York Rules of Professional Conduct, this Complaint is accompanied only by thirteen of thirty-four exhibits - Exhibits 2, 3, 6, 7, 10, 11, 12, 20, 21, 25, 26, 27 and 28, each containing information reasonably believed to be necessary to establish or collect a fee.  Once the Complaint is filed and Service of Process is completed, the Plaintiff intends to file a Motion for Protective Order which would seek to provide the Court with the unfiled remaining exhibits for in-camera review, while protecting from public disclosure the confidentiality of those unfiled exhibits which contain attorney-client confidential information, propriety information, and attorney work product.

had drafted and executed in New York, after Defendants Beverly Brace, Randall Brace and Ronald Brace had each reviewed said agreement and consented to Defendant Robert Brace's exercise of their shareholder voting rights in the respective Defendant corporations to take such action. (Ex. 2).

17.     The Plaintiff had performed a substantial portion of the analytical and written legal work on the Defendants' behalf with respect to both the new '90 action and the new '17 action, from January 25, 2017 through June 2019, in the State of New York.

18.     Defendant Robert Brace had transmitted to the Plaintiff in New York via countless emails and dispatched to the Plaintiff's New York address through the traditional mail hundreds of documents relating to the prior '90 action, plus hundreds of articles and correspondences from the 1980' and1990's relating to the Clean Water Act's wetlands provisions and to the Defendants' prior public advocacy activities and website, which the Plaintiff reviewed in New York during the entire course of the Plaintiff's representation of the Defendants in both federal actions.

19.     The individual Defendants had frequently initiated extensive telephone and email communications with the Plaintiff (on their own behalf and on behalf of the Defendant corporations in which they owned stock and for which they worked), contacting its New York telephone number and email address during the entire term of the Plaintiff's representation of the Defendants in both federal actions, that enabled the Plaintiff to establish and maintain a substantial ongoing professional commitment between itself and the Defendants.

20.     This cause of action arises from these ongoing professional relationship/business transactions.

21.     The choice of law clause of the KLG-Brace Engagement Agreement that Defendant Robert Brace had executed as described in paragraph 16 above, specifically provides that the terms of the agreement are to be construed according to the laws of the State of New York. (*Id*.).

22.     Defendant Robert Brace had further contacts with New York State having previously entered into an easement agreement in August 2012 with William Bartlett, a citizen of New York State owning land in Pennsylvania located adjacent to those of Defendants' farm tract subject to dispute in the '17 action, over which this Court could have properly asserted personal and subject matter jurisdiction over the Defendants pursuant to New York State's long-arm statute (NYCPLR § 302(a)(1)) had such easement agreement fallen into dispute.

## FACTUAL ALLEGATIONS

23.     Defendants Robert Brace and Beverly Brace first solicited the Plaintiff's principal to represent the interests of their family and their family businesses in two threatened federal Clean Water Act litigations on or about October 22, 2016, at the Twentieth Annual National Conference on Private Property Rights convened by the nonprofit Property Rights Foundation of America in Latham, New York.

24.     On January 25, 2017, Defendant Robert Brace, in both his individual capacity, and his capacity as Majority Shareholder and Manager of Defendants Robert Brace Farms, Inc. and Robert Brace & Sons, Inc., formally engaged and retained the Plaintiff by executing the KLG-Brace Engagement Agreement (*Id*.), to perform legal, lobbying and policy-related services ("professional services") on their behalf with respect to both the '17 and '90 actions, for which the Defendants agreed to pay fees at Plaintiff's discounted hourly rate, plus all out-of-pocket costs.

25.     The Defendants solicited and engaged the Plaintiff as special environmental defense counsel to assist and then lead a large Erie, Pennsylvania law firm ("local counsels" or

"Knox Law") in the representation of Defendants in two parallel and contemporaneously filed Clean Water Act ("CWA") Section 404 (wetlands) enforcement actions the USDOJ, on behalf of the United States of America, initiated against the Defendants in the U.S. District Court for the Western District of Pennsylvania, on January 9, 2017.

26.     The first CWA Section 404 enforcement action (1:90-cv-00229-SPB) ("the '90 action") had been precipitated by allegedly unauthorized activities Defendants Robert Brace and Robert Brace Farms, Inc. had conducted during 2012-2013 on 30 acres of a Brace-owned 58-acre farm tract located in Waterford Township, Erie County, Pennsylvania.

27.     The United States alleged in the '90 action that such activities violated the December 1996 consent decree that Defendants Robert Brace and Robert Brace Farms, Inc. and the United States had previously executed to resolve the prior CWA Section 404 enforcement action the United States had initiated against Defendant Robert Brace in 1990, regarding allegedly unauthorized activities Brace had conducted on such property from 1985-1987.

28.     The second CWA Section 404 enforcement action (1:17-cv-00006-BR) ("the '17 action"), which the United States had initiated on January 9, 2017 via summons and complaint, alleged that Defendants Robert Brace, Brace Farms, Inc. and Robert Brace & Sons, Inc. had conducted other unauthorized activities in violation of CWA Section 404 during 2012-2013 on 14 acres of an adjacent Brace-owned 20-acre farm tract straddling Waterford and McKean Townships, Erie County, Pennsylvania.

29.     The Defendants retained the Plaintiff following the initiation of these two lawsuits because of the disagreement Defendants had had with Knox Law over prior settlement and litigation strategy in response to the United States' administrative allegations.

30.     The Defendants also retained the Plaintiff because they had preferred to mount a robust defense against the United States Government's allegations of CWA Section 404 violations rather than to settle them in a manner requiring the Defendants' payment of money damages and agreement to seek a CWA 404 permit to farm any portion of either of their farm tracts.

31.     Defendant Robert Brace, in particular, had insisted that the Plaintiff essentially undertake a forensic legal review of nearly thirty (30) years of documentation he had accumulated leading to and following the '90 action Consent Decree, and that the Plaintiff aggressively defend the Defendants' legal interests in the parallel '90 Consent Decree enforcement action and the '17 CWA 404 violation action, and consequently, the United States took an equally aggressive stance, thereby resulting in a great deal of motion practice in both actions prior to, during and following discovery.

32.     From February through May of 2017, the Plaintiff assisted Knox Law in pursuing court-ordered mediation during which the parties explored settlement of both United States actions.

33.     However, once it became clear that the United States would not agree to what the Defendants considered a reasonable settlement, the Defendants decided that the Plaintiff would lead Knox Law in both actions, on the Defendants' behalf, in pursuing a robust defense against the government's allegations.

34.     At the Defendants' insistence, from early October 2017 through June 2018,[2] the Plaintiff led Knox Law counsels in conducting an extensive factual and expert discovery, the scope

---

[2] The court in the '17 action had ordered the Braces' discovery period completed as of June 30, 2018, while it extended the Government's discovery period until the completion of its depositions of the Defendants' wetland experts with respect to the second of their two '17 action expert reports, on August 3, 2018. The court in the '90 action, meanwhile, had effectively extended the discovery period for the Defendants until the filing of their redrafted 60(b) motion in February 2019.

of which the United States vigorously sought to narrow, and in conducting an aggressive motion practice in defense of the Defendants' interests in both actions.

35.     At the Defendants' insistence, the Plaintiff convened and defended almost entirely alone 26 factual and expert depositions, all of which but for 3 convened in Idaho, Defendants Robert Brace and Beverly Brace had attended.

36.     To protect the Defendants' interests in the '17 action, the Plaintiff secured the Defendants' approval and authorization to retain independent wetland experts (Kagel Environmental, LLC) ("KE") whom the Defendants had commissioned in January 2018 to develop two expert reports, one rebutting the Government's expert wetland reports alleging the current and historical wetland status of the Brace farm tract in dispute in the '17 action, and the other evaluating and affirming the current and historical *non*-wetland status of, the Brace farm tract in dispute in the '17 action.

37.     To protect the Defendants' interests in the '90 action, during December 2018, the Plaintiff finally secured the Defendants' approval to re-engage their existing wetland experts (KE) to develop a third expert report – the first-ever affirmative expert report evaluating and affirming the *non*-wetland status of the Brace farm tract in dispute in the '90 action.

38.     The Plaintiff had retained the independent wetland experts (KE) as the Plaintiff's subcontractors to ensure attorney-client confidentiality, and consequently, while the experts performed the work on the Defendants' behalf, the Plaintiff remained liable to the experts for ensuring payment for their services.

39.     To protect the Defendants' interests in both the '17 and '90 actions *and* in the Federal Torts Claim Act action the Defendants had planned to file against the federal government

at the Federal Court of Claims,[3] the Plaintiff, in March 2018, secured the Defendants' approval and authorization to seek out and retain hydraulic/hydrologic engineering experts to evaluate and develop a report assessing the impact of the periodic ongoing flooding of the watercourses traversing the Defendants' Waterford and McKean Townships farm that the Defendants had experienced since the implementation of the '90 action 1996 consent decree, on the Brace farm tracts in dispute in both actions, which experts the Defendants finally retained directly in June 2018.

40.     During the course of the '17 and '90 actions, the Plaintiff also battled virtually alone federal government and court opposition to the Defendants' obtaining the opportunity to conduct further discovery for purposes of securing expert wetlands and hydraulic/hydrologic engineering experts to evaluate and report on the status and operation of the Brace farm tracts and watercourses in dispute in both actions.

41.     The Plaintiff, furthermore, battled virtually alone federal government and court opposition (in the '90 and '17 actions) to the Defendants' securing admission into the pretrial record of their experts' reports and testimonies.

42.     During this period of extensive joint ('90 action and '17 action) factual and expert discovery, the Defendants, at no time, indicated to the Plaintiff they would be unwilling to pay for any future legal services arising from such discovery.

43.     Throughout the entire period of the Plaintiff's representation of the Defendants in both actions, the Plaintiff had continued to discount its hourly billing rate, and to provide additional

---

[3] The Defendants had commissioned the Plaintiff to prepare an administrative federal torts act complaint against the Federal Government, which the Plaintiff had prepared by June 2017, and the Knox Law counsels had filed with the U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers during early July 2017. The filing of the administrative complaint with the agencies was a prerequisite to later filing suit in the Claims Court. No Claims Court action was ultimately filed because of the Defendants' nonpayment of fees.

accommodations by allowing Defendants to pay the Plaintiff's monthly invoices on an ongoing deferral/deferred basis.

44.     As the result of the Plaintiff's agreement to allow the Defendants to defer payment of the Plaintiff's outstanding invoices, as set forth in the KLG-Brace Engagement Agreement, the September 4, 2018 accounts receivable aging ("A/R aging") the Plaintiff dispatched to the Defendants showed an outstanding invoice balance through August 31, 2018, due and owing to the Plaintiff for legal services it rendered during 2017 and 2018, of $336,795.64.  (Ex. 3).

45.     From August 16, 2018 through September 12, 2018, the Defendants and Plaintiff intensely discussed the Defendants' alleged "need" to secure from Plaintiff further substantial billing concessions, allegedly in order to secure additional bank financing to operate the Defendants' farming businesses. (Ex. 4).

46.     The Defendants had insisted in emails dispatched to the Plaintiff on September 4, 2018 and September 7, 2018, that the Plaintiff must perform *free-of-charge* all future work needed in both actions to bring each litigation to the point where each presiding judge could render a final pretrial determination on the merits, before the bank would allegedly be willing to extend financing to the Defendants. (Ex. 4).

47.     The Plaintiff responded to the Defendants' claimed "need" for such additional billing concessions via email on September 6, 2018, generously offering in a counterproposal of that date to provide such concessions in exchange for immediate payment of all then outstanding invoices totaling $336,795.64, which Defendants refused, and then, again via email on September 10, 2018, with two overly generous alternative counterproposals dated September 9, 2018 – Option #1 would have required, in exchange for all the services identified which the Plaintiff would provide free-of-charge, as the Defendants had requested, the Defendants would have to pay one-

half ($168,397.82) of the total $336,795.64 then outstanding invoice balance by October 15, 2018, and the remaining one-half total invoice balance ($168,397.82) by March 15, 2019 in four equal monthly installments, while Option #2 would have required, in exchange for all the services identified which the Plaintiff would provide for only $40,000, the Defendants would have to pay one-half ($168,397.82) of the total $336,795.64 then outstanding invoice balance by October 15, 2018, the remaining one-half total invoice balance ($168,397.82) by March 15, 2019 in four equal monthly installments, and the $40,000 fee by April 15, 2019. (Ex. 4); (Ex. 5).

48.     Since the Defendants, however, refused to agree to the terms of the September 6, 2018 or the September 9, 2018 alternative counterproposals and did not execute any of the three alternative proposed addendums to the KLG-Brace Engagement Agreement, the Plaintiff stated clearly to the Defendants in an email dated September 12, 2018, *first*, that on account of the urgency of the immediate work needed to be performed in both actions within prescribed respective September 15, 2018 and September 25, 2018, deadlines in both actions, it had withdrawn the overly generous billing concessions it had offered to the Defendants on September 6, 2018 and on September 9, 2018, which the Defendants had rejected, and *second*, that the Plaintiff would continue to bill the Defendants, at the Plaintiff's regular hourly rate pursuant to the ongoing KLG-Brace Engagement Agreement, for all of the legal work that the Plaintiff still needed to perform in September and October 2018 to protect the Defendants' interests in both litigations. (Ex. 4).

49.     The dockets for the '90 action and the '17 action each ultimately revealed that the Plaintiff had severely underestimated the amount of additional work the Plaintiff then still needed to perform in both actions during those and the coming months to enable the courts in both actions

to make a final pretrial determination on the merits, due, in large part, to the United States' subsequent evolving-in-real-time aggressive motion practice. (Ex. 6); (Ex. 7).[4]

50.    The Defendants did not terminate the Plaintiff's legal representation at such time, and the Plaintiff did not withdraw from legal representation of the Defendants at such time.

51.    The Plaintiff, instead, spoke with Knox Law counsels about whether the judges in each case would permit the Plaintiff to withdraw from its legal representation of the Defendants because of the Defendants' substantial nonpayment of KLG invoices, considering the important evidentiary and procedural pleadings still to be prepared and filed in both actions.

52.    Plaintiff had discussed the issue of its potential withdrawal from representation under these circumstances with the Knox Law counsels, given the mandates of Rules 1.16(a)(3), (b)(1) and (b)(5) and (c)(1) of the Pennsylvania Rules of Professional Conduct[5] to which Plaintiff's principal remained subject as counsel *pro hac vice* in both litigations.

53.    The Knox Law counsels responded that, in light of the legal work still needed to be performed in both actions, the judge in each case would not likely approve of the Plaintiff's

---

[4] For example, one additional unanticipated pleading the Plaintiff was required to prepare in the '17 action resulted from the Government's unanticipated aggressive filing during October 2018 of a Show Cause Order seeking monetary and equitable sanctions against the Plaintiff for filing two Daubert motions one day past the court-ordered deadline, which the '17 court swiftly granted. Other unanticipated pleadings included the Governments motions in both the '90 and '17 actions to strike numerous exhibits accompanying their filings.

[5] PA Code of Prof. Conduct, Rule 1.16(a)(3) provides that: "(a) Except as stated in paragraph (c), a lawyer […]  where representation has commenced, shall withdraw from the representation of a client if: (3) the lawyer is discharged." The Braces had not discharged KLG at this time.  PA Code of Prof. Conduct, Rule 1.16(b)(1) provides that: "(b) Except as stated in paragraph (c), a lawyer made withdraw from representing a client if: (1) withdrawal can be accomplished without material adverse effect on the interests of the client; […] (5) the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled." Notwithstanding the Brace's failure to substantially fulfill their obligation to pay a greater portion of the outstanding invoice balance then due and owing to KLG, given the nonstop pleadings in both actions, the expert discovery needs in the '17 action, and KLG's responsibilities to other of its clients, KLG had only begun to demand payment of the substantial outstanding Brace invoices during September 1-4 2018. Therefore, KLG had not yet provided the Braces with a reasonable warning that KLG would withdraw unless the obligation was fulfilled.  PA Code of Prof. Conduct, Rule 1.16(c)(1) provides that: "A lawyer must comply with applicable law requiring notice to or permission of a tribunal when terminating a representation. When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation."  KLG and the Braces' local counsels had concurred that, because of the important pleadings still to be filed in these actions, it was unlikely the judges would approve of KLG's withdrawal at such time.

withdrawal from representation at such time because the Plaintiff's withdrawal at that time could not be accomplished without material adverse effect to the Defendants' interests.

54.    The Knox Law counsels also stated that they were unwilling and unable to assume the Plaintiff's representative role in these litigations because of the extra time and cost it would take for them to substantively re-engage in both actions, which would likely cause significant delays in the proceedings[6] that the judges presiding in each case would likely prohibit/disallow.

55.    The Plaintiff, consequently, had no choice but to proceed to prepare the important evidentiary and responsive pleadings described above that were needed to protect the Defendants' interests in both actions.

56.    On November 4, 2018, the Plaintiff provided the Defendants with invoices for the extensive legal work (including motion practice) the Plaintiff had performed to support the scientific defense of the Defendants' interests in both the '90 and '17 actions during September and October 2018, at a further discounted rate.  (Ex. 8); (Ex. 9).

57.    The further discounted rate that the Plaintiff provided to the Defendants assumed the formed of a "cap" on the number of hours for which Plaintiff had billed in a day to complete the required tasks which the Plaintiff agreed would not exceed 8 hours no matter how many hours had actually been required to get the job done.

58.    The Plaintiff had provided this extra discount for the months of September and October 2018, which had amounted to $23,250, even though the Defendants had not asked the Plaintiff to provide it.

---

[6] It was KLG's understanding that local counsels had been unwilling to represent the Braces in these litigations substantively, in part, due to the Braces' failure to remit payment for prior work local counsels had performed prior to the Braces' retention of KLG, which the Braces believed had resulted in these litigations.

59.     On November 6, 2018, the Plaintiff dispatched to the Defendants an accounts receivable ("A/R") aging indicating that the Plaintiff had, during October 2018, received payment from Defendants of $68,118.54 to finally zero-out the outstanding 2017 (October-December 2017) invoice balance in both actions, and which declared a remaining outstanding 2018 (January - August 2018) invoice balance in both actions due and owing to the Plaintiff, of $268,677.10. (Ex. 10).

60.     The Plaintiff's November 6, 2018 A/R aging also noted that the Plaintiff had rendered, during September and October 2018, an additional $96,187.50 worth of professional services to protect the Defendants' interests in both actions, which raised the remaining outstanding 2018 (January-October 2018) invoice balance from $268,677.10 to $364,824.60. (Ex. 10).

61.     On November 7, 2018, the Defendants responded via email to the Plaintiff's November 6, 2018 A/R aging, indicating that they would not pay for any of the legal services Plaintiff had rendered in preparing and filing the necessary pleadings in both litigations during September and October 2018, and that they would make payment only up to the past due invoice balance, as of August 31, 2018, or $336,795.44. (Ex. 4).

62.     The Defendants' November 7, 2018 email conveyed Defendants' refusal to pay for any of the necessary services the Plaintiff had performed in September and October 2018, in complete disregard of how the circumstances at hand – i.e., the unavailability of affordable competent replacement counsel to prevent adverse consequences to the Defendants' interests in these litigations – had compelled the Plaintiff's principal, after conferral with Knox Law, to fulfill his ethical and professional obligations to render such services on the Defendants' behalf. (Ex. 4).

63.     The Defendants' November 7, 2018 email also indicated, for the very first time, that because the term of the KLG-Brace Engagement Agreement had been only for one-year and the parties had not renewed said agreement in writing since January 2018, the Defendants were not obligated to pay for the necessary services the Plaintiff had rendered in good faith during September and October 2018. (Ex. 4).

64.     The Defendants' November 7, 2018 email indicated, in addition, that although the Defendants would soon make payment to the Plaintiff for two additional invoices in the approximate amount of $100,000 (which would pay for the outstanding January and February 2018 invoices and a small portion of the March 2018 invoice), the Defendants would not make any further payments to the Plaintiff for other 2018 invoices until an unknown future date when the presiding judge in the '90 action made a final pretrial ruling on the merits,[7] and at such time, would make payment to the Plaintiff of no more than $336,795.44 – the outstanding invoice balance as of August 31, 2018. (Ex. 4).

65.     The Defendants' November 7, 2018 email's reference to a one-year term, as noted in paragraph 63 above, contradicted the promise the Defendants had then just made in the same email to make payment for professional services the Plaintiff had rendered in both actions during January, February and the first week of March 2018, and furthermore, it clearly ignored that the parties had not previously, during their early September 2018 negotiations, reached any agreement to modify the KLG-Brace Engagement Agreement payment provision to require the Plaintiff to provide any *free-of-charge* post-August 2018 professional services.

66.     The Defendants' November 7, 2018 email, therefore, falsely intimated that the Defendants and the Plaintiff had previously reached agreement on one or more of the proposed

---

[7] As of the date of this filing, the judge in the '90 action still has not made a final pretrial determination on the merits based on the Plaintiff's making of one such filing – a redrafted 60(b)(5) motion.

September 2018 alternative addendums to the KLG-Brace Engagement Agreement, *none of which, in fact,* the Defendants had ever executed, and all of which the Defendants had, *in fact, refused to execute*, as noted in paragraphs 47-48 and 65 above, which false intimation the Defendants effectively used as a putative justification to proclaim that they would not make payment to the Plaintiff of more than the outstanding August 31, 2018 invoice balance of $336,795.44. (Ex. 4).

67.     The Defendants' November 7, 2018 email also falsely misrepresented that the Defendants had "basically fir[ed]" the Plaintiff, and it falsely intimated that the Plaintiff had agreed to perform all of the legal services necessary to complete the required pleadings to enable the presiding judge in the '90 action to make a final pretrial ruling on the merits, *free-of-charge*, <u>to which the Plaintiff emphatically had *not* previously agreed</u>. (Ex. 4).

68.     Since the Plaintiff's receipt, during mid-November 2018, of the Defendants' $100,000 payment for the legal services the Plaintiff had previously rendered during January 2018, February 2018, and the first week of March 2018, the Defendants have failed and refused to make further payment to the Plaintiff for any of the necessary and extensive legal services the Plaintiff had rendered to protect the Defendants' interests in both actions during the <u>16-month</u> period, spanning from early March 2018 through early June 2019. (Ex. 11); (Ex. 12).

69.     The Defendants have since failed and refused to pay for the necessary and extensive professional services that the Plaintiff had rendered to protect the Defendants' interests in both actions during this period even though the Defendants had requested that the Plaintiff render these services and had been well aware that the Plaintiff had indeed provided them. (Ex. 13).

70.      The Defendants have since failed and refused to pay in a timely manner for the necessary and extensive professional services that the Plaintiff had rendered to protect the Defendants' interests in both actions, during the <u>six (6)-month</u> period spanning from early March

2018 through August 31, 2018, even though the Plaintiff had performed these services at its regular hourly discounted rate and had acceded to the Defendants' request to defer payment of the invoices corresponding thereto for many months.

71.     The Defendants have since failed and refused to pay for the necessary and extensive professional services that the Plaintiff had rendered to protect the Defendants' interests in both actions, during the ten (10)-month period spanning from September 1, 2018 through June 6, 2019, even though the Plaintiff had performed these services at a greater discount than its regular hourly discounted rate – i.e., at its regular hourly discounted rate *plus* a daily rate cap of no more than eight hours per day, *and* had accepted Defendants' request to defer payment of the corresponding invoices for a number of months. (Ex. 13).

72.     The dockets for both the '90 and '17 actions clearly reveal all of the necessary and extensive legal services that the Plaintiff had rendered to protect the Defendants' interests in both actions during the sixteen (16)-month period spanning from early March 2018 through early June 2019, which the Defendants had requested, but have failed and refused to remit payment of the monthly invoices detailing those services, despite Plaintiff's multiple demands for payment. (Ex. 6); (Ex. 7).

73.     On March 6, 2019, March 30, 2019, June 13, 2019, June 19, 2019, and July 15, 2019, Plaintiff dispatched to the Defendants invoices, accounts receivable ("A/R") agings, and demands for payment detailing all of the necessary prior unpaid professional legal services work the Plaintiff had performed to protect the Defendants' interests in both the '90 and '17 actions. (Ex. 11); (Ex. 12); (Ex. 14); (Ex. 15); (Ex. 16).

74.     The Plaintiff's unpaid invoice balance, covering invoices dating back from early March 2018 through June 6, 2019 – <u>a sixteen (16)-month period</u> – total $479,639.70, *without* accrued interest, as of this filing.

75.     The Plaintiff provided the Defendants with many opportunities over the course of many months to fulfill their payment obligations under the KLG-Brace Engagement Agreement on a deferred but structured basis, over time, which payment obligations the Defendants, as of this filing, have substantially failed to fulfill in material breach of the KLG-Brace Engagement Agreement.  (Ex. 17).

76.     It is the Plaintiff's understanding that the total unpaid invoice balance due and owing to the wetland experts, Kagel Environmental, LLC ("KE") the Plaintiff had retained to protect the Defendants' interests, for work KE had performed with the Defendants' authorization, from November 2018 through February 2019 in the '90 action (to conduct a forensic wetland assessment of the farm tract subject to dispute in the '90 action), is $72,220.13, without accrued interest as of this filing. (Ex. 18).

77.     It is the Plaintiff's understanding that the wetland experts (KE) the Plaintiff had retained to protect the Defendants' interests in both actions had offered to the Defendants a significant invoice discount of $28,832.64 from the work KE had performed in the '90 action ($72,220.13), if the Defendants had chosen to pay the outstanding KE invoices by May 4, 2019, but the Defendants failed and refused to remit payment to KE of the net discounted invoice balance of $43,387.48 by the called-for date. Ex. 18); (Ex. 19); (Ex. 20).

78.     It is the Plaintiff's understanding after speaking with KE representatives that if the Defendants continue to fail and refuse to make payment to said expert (KE) of the outstanding

invoice balance of $72,220.13, KE will have no choice but to file suit against the Plaintiff to secure payment of such amount.

79.     The Plaintiff is a small law firm managed by a solo practitioner specializing in federal environmental law and policy work that is without access to affordable Of-counsels many years skilled in environmental law, whose sole source of income is derived from the rendering of professional services as environmental defense counsel for paying clients.

80.     The Plaintiff, which had other clients it was obligated to service during its representation of the Defendants, had dedicated a significant amount of time (approximately 1,918 billable manhours) to protecting and representing the Defendants' interests in the two parallel federal Clean Water Act ("CWA") actions the United States had filed against them on January 9, 2017, for which Plaintiff still has not been paid, which billable time the Plaintiff could otherwise have devoted to paying clients.

81.     On August 15, 2019, Defendant Robert Brace, acting in both his individual capacity, and his capacity as Majority Owner-Manager of Defendants Robert Brace Farms, Inc. and Robert Brace & Sons, Inc., terminated the KLG-Brace Engagement Agreement, and consequently, the Plaintiff's legal representation of the Defendants' interests in both actions, having first secured the consent of Defendants Beverly Brace, Randall Brace and Ronald Brace to exercise their shareholder voting rights in the respective Defendant corporations to take such action, for the specific purpose of avoiding the Defendants' individual and joint payment obligations under the KLG-Brace Engagement Agreement. (Ex. 21).

82.     The Defendants terminated the KLG-Brace Engagement Agreement and the Plaintiff's legal representation of their interests in both actions, in the manner described in paragraph 81 above, under the false pretense that said termination had been warranted by the '17

action court's adverse August 12, 2019 order granting the United States' summary judgment motion against Defendants, even though the Plaintiff, Knox Law *and* all of the individual Defendants had long previously discussed, been aware of, and expected such a ruling from that court.[8]

83.    On September 13, 2019, after having confirmed with Defendant Robert Brace, on behalf of all the Defendants, that  the Plaintiff's legal representation of the Defendants' interests in both the '90 action and the '17 action had, in fact, been formally terminated, the Plaintiff filed its motions to withdraw as attorney in each action ((Ex. 24); (Ex. 25); (Ex. 26)), which motions were ultimately granted notwithstanding United States opposition. (Ex. 27); (Ex. 28).

84.     The Plaintiff has been severely harmed financially as the result of the Defendants' substantial nonfulfillment of their payment obligations under and in material breach of the KLG-Brace Engagement Agreement, both before and after the Defendants had terminated the Plaintiff's representation as described in paragraph 81 above, and the Plaintiff had withdrawn from representation as described in paragraph 82 above.

85.    The Plaintiff has been severely harmed financially as the result of the Defendants' ongoing refusal and failure, as of this filing, to pay even a reasonable fee for the 16-months of professional services the Plaintiff, mostly without the assistance of Knox Law counsels, but with the assistance of the wetland experts the Plaintiff retained with the Defendants' authorization, had rendered to protect the Defendants' interests in the parallel '90 and '17 CWA actions, even when the Plaintiff, as a matter of equity and fairness, had acted more than reasonably by providing the

---

[8] Curiously, the Defendants seemed to have relied on the August 12, 2019 '17 action SJ order's reference to the Plaintiff's minor filing delays (to which motions and/or responses Knox Law, in its supporting role, had signed onto as co-counsel) as the putative grounds for termination, even though the Defendants had long previously been aware of the '17 action court's adverse expert discovery period rulings undermining the Defendants' defense, and of the logistical challenges, workload, scheduling and monetary difficulties the Plaintiff had faced which the '17 action court ignored in issuing its SJ order.  The Defendants also apparently overlooked how the '17 action court SJ order expressed how that court had attributed to the Defendants knowledge of the Plaintiff's actions. (Ex. 22); (Ex. 23, n. 7).

Defendants with considerable billing concessions, including a low hourly billing rate, invoice payment deferrals, and a daily billing rate cap that resulted in additional billing discounts, from September 2018 through June 2019, totaling  $70,250. (Ex. 8); (Ex. 9); (Ex. 29); (Ex. 30); (Ex. 31); (Ex. 32); (Ex. 33); (Ex. 34).

## COUNT I – BREACH OF CONTRACT

86.     The Plaintiff hereby incorporates by reference the allegations set forth above as if fully set forth herein.

87.     The KLG-Brace Engagement Agreement that Plaintiff and the Defendants had executed on January 25, 2017, in the manner described in paragraph 16 above, which remained in full force and effect until the Defendant's termination of the Plaintiff's representation on August 15, 2019, is a valid and binding contract containing scope of work, payment, and termination provisions.

88.     Following unsuccessful March – May 2017 mediation negotiations with the United States, the Defendants insisted that the Plaintiff take the lead as environmental litigation defense counsel in protecting the Defendants' interests in both the '90 and '17 parallel actions, and the Plaintiff agreed to undertake those tasks on Defendants' behalf, consistent with the terms of the KLG-Brace Engagement Agreement as so informed by the parties' subsequent practices.

89.     The Plaintiff performed any and all conditions precedent and obligations under the KLG-Brace Engagement scope provision as so broadened by the parties' practices following the unsuccessful mediation negotiations, for which it is seeking payment for professional services rendered, from March 2018 through June 2019.

90.     The Defendants are indebted to the Plaintiff for professional legal services the Plaintiff, itself, rendered pursuant to the KLG-Brace Engagement Agreement, in both the '17 and

'90 actions, from March 2018 through June 2019, in the amount of $479,639.70, without regard to interest.

91.     The Defendants also are indebted to the Plaintiff for the fees charged for professional consulting services rendered by the wetland experts the Plaintiff had retained with the Defendants' authorization to protect the Defendants' interests in both the '17 and '90 actions, from September 2018 through February 2019, payment for which the Plaintiff is primarily responsible, in the amount of $72, 220.13, without regard to interest.

92.     Although the Plaintiff has demanded payment from the Defendants, the Defendants have failed and refused to pay.

93.     Although KE has demanded payment from the Defendants, the Defendants have failed and refused to pay.

94.     The Plaintiff has been directly and indirectly damaged in the total amount of $551,913.83, by the Defendants' non-payment for these legal and nonlegal professional fees.

## COUNT II – QUANTUM MERUIT

95.     The Plaintiff hereby incorporates by reference the allegations set forth above as if fully set forth herein.

96.     At the Defendants' request and insistence, the Plaintiff, in good faith, worked tirelessly as lead, and often, sole environmental litigation defense counsel for a period of 15 months during 2018 and 2019, to protect the Defendants' interests in two parallel Clean Water Act litigations filed by the U.S. Department of Justice.

97.     At the Defendants' request and insistence, the Plaintiff also provided significant billing discounts and accommodations to the Defendants with respect to the professional services it rendered on the Defendants' behalf, as explained above.

98.     The Defendants accepted those services freely.

99.     The Plaintiff reasonably expected to receive compensation from the Defendants for those services, both during and after its representation of the Defendants' interests in both actions had been terminated and the Plaintiff had withdrawn as counsel, as described in paragraph 83 above.

100.    The reasonable value of those services is $479,639.70.

101.    Although the Plaintiff has demanded payment from the Defendants on multiple occasions, the Defendants have failed and refused to pay any sum(s), and the amount(s) of the outstanding invoices due and owing to the Plaintiff remain unpaid.

102.    With the Defendants' authorization, the Plaintiff retained the professional services of wetland experts Kagel Environmental, LLC ("KE") to defend and protect the Defendants' interests in the '17 and '90 actions by tirelessly evaluating and reporting, during 2018 and 2019, to the courts and the United States the true wetland status of the Defendants' two farm tracts in dispute in these actions.

103.    The wetland experts (KE) the Plaintiff retained on the Defendants' behalf provided significant billing discounts to the Defendants with respect to the professional services they rendered on the Defendants' behalf, as explained above.

104.    The Defendants accepted those services freely.

105.    The wetland experts (KE) the Plaintiff retained on the Defendants' behalf reasonably expected to receive compensation from the Defendants for those services.

106.    The reasonable value of those services is $72,220.13.

107.    Although the wetland experts (KE) have demanded payment from the Defendants on multiple occasions, the Defendants have failed and refused to pay any sum(s) and the amount(s) of the outstanding invoices due and owing to KE remain unpaid.

108.    Because the Defendants have failed and refused to pay any sum(s) and the amount(s) of the outstanding invoices due and owing to KE remain unpaid, the Plaintiff's reputation in the eyes of KE has been harmed and, as the result, the Plaintiff is in danger of being sued by KE for the full amount of the unpaid outstanding invoices.

109.    The Plaintiff has been directly and indirectly damaged by the Defendants' non-payment of the outstanding invoices due and owing to the Plaintiff and to KE for professional services each has rendered on the Defendants' behalf, the total reasonable value of which is $551,913.83.

## COUNT III – UNJUST ENRICHMENT

110.    The Plaintiff hereby incorporates by reference the allegations set forth above as if fully set forth herein.

111.    The following count applies only with respect to the unpaid otherwise reimbursable expenditures the Plaintiff incurred incidental to rendering the services referenced in the allegations set forth above.

112.    During the pendency of the KLG-Brace Engagement Agreement, and at the request of Defendants and to their benefit, the Plaintiff, at its own expense, advanced the cost of travel, transportation, parking, lodging, and meals and entertainment it incurred incidental to its provision of necessary legal defense services in both the '17 and '90 actions, from March 2018 through April 2019.

113.    Under these circumstances, equity and good conscience demand that the Defendants give restitution for their receipt of the benefits that the Plaintiff conferred, in the amount of the reasonable reimbursable costs the Plaintiff had advanced.

114.    The total amount of reasonable reimbursable costs the Plaintiff advanced is $2,803.21.

115.    Although the Plaintiff has demanded payment, the Defendants have failed and refused to pay such sum and the amount remains unpaid.

116.    The Plaintiff has been damaged by the Defendants' non-payment.

## COUNT IV – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

117.    The Plaintiff hereby incorporates by reference the allegations set forth above as if fully set forth herein.

118.    A covenant of good faith and fair dealing in the course of the contract performance is implicit in all contracts.

119.    The purpose of the implied covenant of good faith is to further an agreement by protecting the promise against a breach of the reasonable expectations and inferences otherwise derived from the agreement, and consequently, the covenant of good faith and fair dealing protects the bargained-for terms of the agreement.

120.    The Plaintiff has performed all conditions, covenants, and promises required to be performed by the Plaintiff in accordance with the terms of the KLG-Brace Engagement Agreement.

121.    In contravention of these bargained-for terms, the Defendants have falsely misrepresented that they were unable to pay the reasonable value of the professional services the Plaintiff rendered on their behalf pursuant to the Engagement Agreement, from March 2018

through June 2019, on the false putative grounds that it could not obtain a United States Department of Agriculture or other federal agency guarantee of the commercial bank loans they had sought to secure to operate their farming businesses, because the Plaintiff had not agreed to perform all of the necessary legal defense services in both actions on the Defendants' behalf *free-of-charge*, from September 2018 until some unknown future time when each action would be brought to the point where each presiding judge could render a final pretrial determination on the merits.

122. The Plaintiff proceeded to perform all of the legal services necessary in both the '17 action and the '90 action, from September 2018 through June 2019, to enable the judge in each action to render a decision on the merits, as the Defendants had requested, even when the parties could not reach the agreement that Defendants had sought in September 2018, as a matter of implied good faith and fair dealing between the parties, in return for the expectation that the Defendants ultimately would compensate the Plaintiff for all of its efforts and hard work.

123. In contravention of the bargained-for-terms of, and for the purpose of avoiding their implied promise not to breach the reasonable expectations and inferences from which the Plaintiff would otherwise have benefited under the KLG-Brace Engagement Agreement, namely, the fruits of the sixteen (16) months of labor in which the Plaintiff had engaged on the Defendants' behalf from March 2018 through June 2019, and the ability to secure payment for the services that Defendants' wetland experts had rendered on the Defendants' behalf from November 2018 through February 2019, the Defendants have falsely mispresented as the basis for their August 15 termination of the Plaintiff, the long-expected '17 action August 12, 2019 adverse summary judgment ruling.

124.     The Defendants have breached the covenant of good faith and fair dealing implied and so interwoven in the Engagement Agreement as to be necessary for and integral to the Plaintiff's robust defense of the Defendants' interests in both the '17 and '90 actions, by unfairly interfering with, withholding, and depriving the Plaintiff of its right to receive the benefits (fruits) of the Engagement Agreement.

125.     As a direct and proximate result of the Defendants' breach of the implied covenant of good faith and fair dealing, the Plaintiff has suffered, and will continue to suffer, monetary damages in the amount of $551,913.83.

## COUNT V – PIERCING THE CORPORATE VEIL

126.     The Plaintiff hereby incorporates by reference the allegations set forth above as if fully set forth herein.

127.     The following count applies for liability purposes only to Defendants Beverly Brace, Randall Brace and Ronald Brace.

128.     Defendants Beverly Brace, Randall Brace and Ronald Brace are individual Alter Ego(s) of Defendants Robert Brace Farms, Inc. and Defendant Robert Brace & Sons, Inc., and their conscious decisions as minority shareholders, employees and managers of these Defendant corporations concerning the business activities and relationships such corporations conduct and maintain with third parties, including the Plaintiff, justifies piercing the corporate veil of each such corporate Defendant.

129.     Defendants Robert Brace Farms, Inc. and Robert Brace & Sons, Inc. are engaged in the same business, have the same customers, use the same farm buildings and equipment, purchase the same farm materials and supplies, and use the same employees, contractors and legal and financial representatives.

130.    Defendants Robert Brace and Beverly Brace are each majority shareholders owning 100% of the voting stock of Defendant Robert Brace Farms, Inc. as tenants by the entirety.

131.    Defendant Robert Brace is the President, Chief Executive Officer and key employee who performed services on behalf of Defendant Robert Brace Farms, Inc. during the period of the Plaintiff's legal representation of all Defendants.

132.    Defendants Robert Brace, Randall Brace, Ronald Brace and Beverly Brace are employees of and perform farm and administrative work for Defendant Robert Brace Farms, Inc., but they were not on the payroll of or paid a wage by Defendant Robert Brace Farms, Inc. for such work during the period of the Plaintiff's legal representation of all Defendants.

133.    Defendant Robert Brace is the majority shareholder owning 51% of the voting stock of Defendant Robert Brace & Sons, Inc.

134.    Defendants Randall Brace and Ronald Brace are each individually a minority shareholder owning 24.5% of the voting stock of Robert Brace & Sons, Inc., and they are collectively the minority shareholder, holding 49% of the voting stock of Defendant Robert Brace & Sons, Inc.

135.    Defendants Beverly Brace, Randall Brace and Ronald Brace are each an employee on the payroll of and being paid a wage or some other form of compensation by Defendant Robert Brace & Sons, Inc., for performing administrative and bookkeeping work and farming work, respectively, on behalf of both Defendant Robert Brace Farms, Inc. and Defendant Robert Brace & Sons, Inc. during the period of the Plaintiff's legal representation of all Defendants.

136.    Defendant Robert Brace is not paid a salary by either Defendant Robert Brace Farms, Inc. or Defendant Robert Brace & Sons, Inc., in exchange for handling the corporate and

finance matters of each entity, but he is paid in other forms of compensation for such services by such entities.

137.    Defendants Robert Brace Farms, Inc. and Robert Brace & Sons, Inc. share common office space, address and telephone numbers.

138.    The farming businesses of Defendant Robert Brace Farms, Inc. and Defendant Robert Brace & Sons, Inc. are conjoined and operate together using the lands that are owned and leased by Defendants Robert Brace Farms, Inc., Robert Brace & Sons, Inc. and/or Robert Brace.

139.    Defendant Robert Brace is the common controlling 51% majority voting shareholder in both Defendant Robert Brace Farms, Inc. and Robert Brace & Sons, Inc., which are members of the same brother-sister controlled group of corporations that apportion between them different tax items, including annual revenues, expenses, net operating losses, depreciation of buildings and other assets, etc., for federal income tax purposes, such that the Defendant entities arguably are not treated as independent profit centers.

140.    Defendants Robert Brace Farm, Inc. and Robert Brace & Sons, Inc., individually and together, lack the formalities and paraphernalia that are part and parcel of the corporate existence, including the election of directors, and the keeping of current corporate records, including voting records of shareholder and management decisions.

141.    Defendant Robert Brace charges for general use, including for business and entertainment engaged in on behalf of Defendant Robert Brace & Sons, Inc. and Defendant Robert Brace Farms, Inc., and for personal use, such as meals, etc., a credit card provided and/or paid for by Defendant Robert Brace & Sons, Inc.

142.    Defendant Beverly Brace charges for general use, including for office supplies obtained for both Defendant Robert Brace & Sons, Inc. and Defendant Robert Brace Farms, Inc.,

and for personal items such as groceries and meals, a credit card provided and/or paid for by Defendant Robert Brace & Sons, Inc.

143.    Defendant Robert Brace has borrowed monies from commercial lenders in the name of Defendants Robert Brace Farms, Inc. and Robert Brace and Son, Inc. to conduct farming operations that were collateralized by corporate assets such as buildings, land and farming equipment owned by Defendant Robert Brace Farms, Inc., and/or Defendant Robert Brace & Sons, Inc., and by personal guarantees secured by personal assets such as land and personal bank and investment accounts owned by Defendants Robert Brace and/or Beverly Brace individually or as tenants by the entirety, and by the individual life insurance policies of Defendant Robert Brace.

144.    Defendants Robert Brace Farms, Inc. and Robert Brace & Sons, Inc., as a general practice depending on each entity's relative cash flow, loaned/advanced monies to and borrowed monies from one another, as needed, as reflected in intercompany loan accounts, to fund the operations of both businesses, in lieu of such Defendants or their shareholders securing monies from commercial lenders, thereby resulting in the thin capitalization of each such Defendant entity.

145.    Defendants Robert Brace, Beverly Brace, Randall Brace and Ronald Brace commingled the funds of the Defendant corporations and used the Defendant corporations to finance their personal expenditures to the extent funds were available, and where no such corporate funds were available because the Defendant corporations were thinly capitalized, Defendants Robert Brace and Beverly Brace loaned personal monies to the corporations directly and indirectly to pay down the debts and liabilities the Defendant corporations owed to third parties, or to pay Defendants Randall Brace or Ronald Brace for their services in the form of payroll or non-payroll compensation.

146.    Defendants Robert Brace, Beverly Brace, Randall Brace and Ronald Brace were present during most, if not, all of the hundreds of hours of in-person and telephone meetings convened by the Plaintiff and the Defendants to discuss the progress of the parallel actions, the strategies and tactics to be employed to achieve the Defendants' litigation objectives in each action, the need for and facilitation of extensive factual and extended expert discovery and the discussion of the Defendants' expert reports in each action.

147.    Following the hundreds of hours of in-person and telephone meetings with the Plaintiff to discuss litigation progress, objectives, strategy, tactics, discovery needs and options that could best protect all of the Defendants' interests in both litigations, Defendants Beverly Brace, Randall Brace and Ronald Brace almost always consciously deferred to the decision of Defendant Robert Brace regarding such matters.

148.    Defendant Robert Brace exercised complete domination over Defendants Robert Brace Farm, Inc. and Robert Brace & Sons, Inc., as the result of the other shareholders of those corporations – i.e., Defendants Beverly Brace, Randall Brace and Ronald Brace – having consciously delegated to Defendant Robert Brace full and complete authority concerning all the above-referenced matters relating to the Plaintiff's legal representation of such Defendant corporations and of the individual Defendant shareholders of those corporations in both the '17 action and the '90 action.

149.    Defendants Beverly Brace, Randall Brace and Ronald Brace consciously allowed and authorized Defendant Robert Brace to use such domination over both Defendant corporations to commit a wrong against the Plaintiff, namely, to breach the implied covenant and good faith and fair dealing, that injured the Plaintiff.

150.     As the result of Defendant Robert Brace's exercise of complete domination over the Defendant corporations, the Plaintiff has been injured in the amount of $551,913.83 for unpaid legal fees, plus $2,803.21 for unpaid reimbursable expenditures.

151.     The facts as asserted above strongly suggest that the corporate veil can be pierced with respect to the Alter Ego(s) of Defendants Robert Brace Farms, Inc. and Robert Brace & Sons, Inc.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully prays that the corporate veil of Defendant Robert Brace Farm, Inc. and the corporate veil of Defendant Robert Brace & Sons, Inc. are each pierced, and that judgement be entered in the Plaintiff's favor and against each and all Defendants, holding them jointly and severally liable as follows:

A.     Granting actual or compensatory damages in the amount of $551,913.83 for the Defendants' breach of contract or for *quantum meruit* or for the Defendants' breach of the implied covenants of good faith and fair dealing;

B.     Granting actual or compensatory damages for reimbursable expenditures incurred in the amount of $2,803.21 to prevent the unjust enrichment of Defendants at the Plaintiff's expense;

C.     Granting costs of suit; and all pre-judgment interest allowable by law;

D.     Granting such other relief that the Court deems just and proper.


Respectfully submitted this 5th day of February 2020.

By:  /s/Lawrence A. Kogan
The Kogan Law Group, P.C.
100 United Nations Plaza, Suite # 14F

New York NY 10017
Telephone: (212) 644-9240
Facsimile: (646) 219-1959
Email:  lkogan@koganlawgroup.com